**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

IN RE AUTOMATIC CARD SHUFFLERS
LITIGATION

No. 21-cv-01798

Judge John F. Kness

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Casino Queen Marquette, Inc. and Casino Queen, Inc. bring this putative class action (Dkt. 120) against Defendants Light & Wonder, Inc. and LNW Gaming, Inc. for violations of antitrust law, alleging that Defendants wrongfully obtained patents for their automatic card shufflers by purposefully failing to disclose relevant prior art to the Patent and Trademark Office (PTO). (Dkt. 1 at ¶ 35.) Plaintiffs allege that Defendants then created a monopoly in the card shuffler market by using these patents to prevent would-be competitors from entering the market. (*Id.* at ¶ 40.) Defendants moved for summary judgment (Dkt. 114) and then Plaintiffs moved for partial summary judgment (Dkt. 127.)

As explained in detail below, the parties' motions are resolved as follows. Plaintiffs' motion for partial summary judgment is denied in full. Contrary to Plaintiffs' contention, Defendants are not estopped to advance their arguments here because Plaintiffs present no evidence that any court in earlier cases relied on purportedly-contrary arguments Defendants advanced in those earlier cases. The on-sale bar record concerning the "Nicoletti" shuffler also presents genuine disputes

unsuitable for judgment as a matter of law.

Defendants' summary-judgment motion is largely denied. Disagreements about product substitution do not overcome Plaintiffs' direct evidence that Defendants held near-total market power over all types of automatic shufflers. Plaintiffs' overcharge and yardstick evidence also creates triable issues on antitrust injury and damages. Separately, Plaintiffs' claims relating to Defendants' alleged anticompetitive abuse of the patent system (known as *Walker Process* claims) survive in large part. Because most of Plaintiffs' *Walker Process* claims survive, the sham-litigation theory survives, as does Plaintiffs' "monopoly broth" theory.

Plaintiffs' motion to certify a class is granted under Rule 23(b)(2) and (b)(3). Rule 23(a) is satisfied, contrary to Defendants' attacks on typicality, because it appears each class member experienced an overcharge. Variation in the amount of overcharge by class member appears minimal, and in any event, that issue goes to the extent of damages rather than the heart of the action. And an injunction would provide indivisible relief against an alleged unitary and unlawful scheme. Moreover, common issues predominate for the damages class with a classwide methodology that fits Plaintiffs' theory. A class action is also superior to individual suits given the nationwide scope, long period, and uniform conduct. As a result, class certification is warranted.

## I.    BACKGROUND

This case arises from the alleged monopolization of the market for automatic card shufflers by Defendants Light & Wonder, Inc. and LNW Gaming, Inc. (Dkt. 1

2

¶ 1.) Defendants have consistently held a nearly 100% share of the United States automatic shuffler market. (Dkt. 131 ¶ 33.) Plaintiffs are two casinos (*id.* ¶¶ 1–2) that seek to represent a class of all purchasers of Defendants' shufflers from April 1, 2009 to present. (Dkt. 1 ¶ 90.)

As background, many casinos rely heavily on automatic shufflers for card games such as poker, blackjack, and baccarat. (Dkt. 116-13 ¶ 8.) Automatic card shufflers fall into four types separated by function: multi-deck batch shufflers, continuous shufflers, single-deck batch shufflers, and specialty shufflers. (Dkt. 116-12 at 9; Dkt. 116-13 at 18–21; Dkt. 131-3 ¶ 53; Dkt. 157 ¶ 4.) Plaintiffs have provided evidence that multifunctional "specialty" shufflers, meaning, shufflers that bridge the gaps between shuffler types, were developed by Defendants' now-extinct competitors. (Dkt. 157 ¶ 4.)

Without the automatic shufflers, casinos would have to either hand-shuffle or use pre-shuffled decks; neither alternative is viable because both are expensive, more susceptible to cheating, and, in some situations, prohibited. (Dkt. 157 ¶¶ 30–31; Dkt. 116-13 ¶ 51.)

According to Plaintiffs' the market for automatic shufflers for casino use is currently valued at about $100 million per year. (Dkt. 1 ¶ 28.) Defendants currently have nearly a 100% share of that market. (*Id.* ¶¶ 35–36; Dkt. 131 ¶ 33.) Plaintiffs allege that Defendants' dominant market share predates the 2004 onset of the allegedly anticompetitive behavior and that such behavior has protected Defendants' market share by excluding would-be-competitors. (Dkt. 1 ¶ 105.)

Plaintiffs allege that Defendants have prevented competitors from entering the market by "obtain[ing] patents through knowing and willful fraud on the USPTO . . . and enforc[ing] those patents even although [Defendants] knew the patents were invalid and unenforceable." (Dkt. 1 ¶ 67.) Plaintiffs allege that Defendants' patent applications and prosecutions were fraudulent because Defendants knowingly omitted information about preexisting automatic shuffler technology—known as material prior art—that would have prevented Defendants from obtaining or enforcing their shuffler patents. (*Id.* ¶ 84.) Plaintiffs allege that Defendants knew of shufflers made Nicoletti, Roblejo, and Luciano and "knowingly incorporated what [Defendants] had learned about aforementioned shufflers into [Defendants'] patents and concealed this prior art from the USPTO." (*Id.* ¶¶ 69–81.)

To make a prima facie showing of an antitrust violation, Plaintiffs must first define the relevant market to show Defendants have market power and that Plaintiffs have suffered damages. *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177–78 (1965). Plaintiffs' complaint defines the relevant market for the antitrust claim as "the market in the United States for automatic card shuffler machines certified and approved for use by casinos." (*Id.* ¶ 27.)

Defendants' alleged abuse of the patent process to monopolize the automatic shuffler has resulted in two other antitrust suits by competitors. In *Shuffle Tech Int'l LLC v. Sci. Games Corp.*, No. 15 C 3702, 2017 WL 3838096, at *1 (N.D. Ill. Sept. 1, 2017), a competitor prevailed on a Sherman Act Section 2 monopolization claim

4

against Defendants based on Defendants' monopolization of the automatic shuffler market through sham patent litigation. Likewise, another competitor also filed suit and prevailed against Defendants at summary judgment. *TCS John Huxley Am., Inc. v. Sci. Games Corp.*, No. 19 C 1846, 2024 WL 1328710, at \*1 (N.D. Ill. Mar. 28, 2024).

Several motions remain pending in the current case. Defendants move for summary judgment on the independent grounds that Plaintiffs have failed to adequately define the product market, failed to provide a sufficiently certain basis for calculating antitrust damages, and failed to provide admissible evidence that the prior art was material. (Dkt. 115 at 1–2.) In the alternative, Defendants move for partial summary judgment based on Defendants' knowledge of the prior art and a lack of evidence as to several of the allegedly fraudulent patents at issue. (*Id.* at 1.) Plaintiffs also move for class certification (Dkt. 120) and for partial summary judgment on key antitrust elements through judicial estoppel and *Walker Process* materiality for certain patents through the on-sale bar (Dkt. 127).

## II.   STANDARD OF REVIEW

Summary judgment is warranted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jewett v. Anders*, 521 F.3d 818, 821 (7th Cir. 2008) (quoting *Magin v. Monsanto Co.*, 420 F.3d 679, 686 (7th Cir. 2005)); *see also* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322−23 (1986). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery

5

and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. As the " 'put up or shut up' moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (quotations omitted).

## III.   DISCUSSION

This Opinion proceeds in three parts. First, Defendants' motion for summary judgment is granted in part and denied in part. Specifically, the antitrust claims, sham litigation and most of the *Walker Process* claims survive. But some *Walker Process* claims are dismissed because Plaintiffs either abandoned them or failed to produce any evidence establishing fraudulent intent. Second, Plaintiffs' motion for partial summary judgment to judicially estop Defendants from arguing key antitrust elements is denied. Finally, Plaintiffs' motion for class certification is granted. Key elements of this antitrust case are established through common evidence and methodologies. Defendants' attacks on these methods go to the weight rather than the sufficiency of the evidence.

### A.   Defendants' Motion for Summary Judgment Is Granted In Part and Denied In Part

Defendants' summary judgment motion challenges: (1) the definition of the relevant antitrust market and whether Plaintiffs have shown Defendants' monopoly power in that market; (2) the sufficiency of evidence that Plaintiffs suffered antitrust

injury from the alleged conduct; (3) the viability of Plaintiffs' *Walker Process* fraud theory; (4) the viability of Plaintiffs' sham litigation theory under the *Noerr-Pennington* doctrine's sham exception; and (5) whether Plaintiffs' attempt to premise liability on the combined effect of multiple actions (a so-called "monopoly broth" theory) is legally improper. Each issue is addressed in turn.

### 1. Legal Standards

**Sherman Act Section 2 Monopolization**. To prove monopolization under Section 2, a plaintiff must show "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). Monopoly power means the ability to control prices or exclude competition in the defined market. *Id.* at 571.

A threshold step in most Section 2 cases is defining the relevant market in which power and anticompetitive effects are assessed. *See id.* at 571–72. This includes a relevant product market and geographic market. The relevant product market comprises all products "reasonably interchangeable by consumers for the same purposes," that is, whether consumers would switch to alternatives if prices rose. *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956).

In this Circuit, courts must apply a rigorous, evidence-based approach. Plaintiffs always bear the burden of proving a relevant market and must satisfy a stringent demand for economic data and analysis rather than relying solely on anecdotal practical indicia. *See Blue Cross & Blue Shield United of Wis. v. Marshfield*

*Clinic*, 65 F.3d 1406, 1410–11 (7th Cir. 1995); *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 664–66 (7th Cir. 2004). But if monopoly power can be shown through direct evidence—such as actual control over prices or exclusion of competition—precise market definition is less critical. *See FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986).

When considering exclusionary acts, the Supreme Court has cautioned courts not to focus on each separate act and thereby miss the forest for the trees. *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962). And the Seventh Circuit similarly recognizes that a monopolist's various exclusionary actions should be viewed in combination when determining whether Section 2 is violated. *City of Mishawaka v. Am. Elec. Power Co.,* 616 F.2d 976, 986 (7th Cir. 1980).

A private Section 2 plaintiff must also demonstrate antitrust injury: that it suffered injury of the type the antitrust laws were intended to prevent. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). This asserted injury must reflect harm to competition itself rather than merely harm to an individual competitor. *See id.* at 488–89. Courts permit a variety of methods to prove damages so long as the approach is grounded in reliable evidence and produces a reasonably certain estimate. *See Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946).

***Walker Process* Fraud**. In *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, the Supreme Court recognized that enforcing a patent obtained by fraud on the PTO can be stripped "of its exemption from the antitrust laws," potentially supporting a Section 2 claim. 382 U.S. 172, 177 (1965). To establish

*Walker Process* fraud, a plaintiff must prove that (1) the defendant knowingly misrepresented or omitted material information with an intent to deceive the PTO; and (2) the PTO justifiably relied on the misrepresentation when it issued the patent. *See Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1069–70 (Fed. Cir. 1998).

Under Federal Circuit law, which governs the patent-law aspects of the claim, inequitable conduct requires clear and convincing proof of both materiality and intent. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011) (en banc). Materiality means the PTO would have reached a different conclusion on the patent's validity if it had the undisclosed information. *Id.* at 1291–92. Intent to deceive requires evidence that the applicant deliberately withheld or misrepresented material information. It may be inferred from circumstantial evidence but gross negligence or mistake is not enough. *Id.* at 1290.

**Sham Litigation and *Noerr-Pennington***. Under the *Noerr-Pennington* doctrine, genuine lawsuits are generally immune from antitrust liability even if motivated by anti-competitive intent. *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 138 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 670 (1965). "Sham" litigation, however, lies outside this rule. A lawsuit is considered a sham if it is objectively baseless, meaning that no reasonable litigant could expect success on the merits, and the litigant whose motives are challenged subjectively intended to interfere with a rival's business relationships through use of the litigation process rather than to secure the outcome of that process. *Prof'l Real Estate Inv'rs,*

9

*Inc. v. Columbia Pictures Indus.* (*PRE*), 508 U.S. 49, 60–61 (1993).

With these standards in mind, the Court turns to the specific issues raised.

> 2.       *Issues of Fact Exist Regarding Market Definition and Monopoly Power*

**Market Definition.** Plaintiffs propose the relevant product market as casino-grade automatic card shufflers certified for use in U.S. casinos. (Dkt. 1 ¶ 27.) In essence, this includes all automatic shuffling machines that meet regulatory standards and functional requirements for casino table games in the United States. (*Id.* ¶¶ 29, 32.) The geographic market is the United States, since gaming regulations and casino operations are region-specific. (*Id.*) Defendants attack this market definition as too broad because it groups together different types of shufflers that Defendants claim do not compete directly with each other (*e.g.*, single-deck vs. multi-deck batch shufflers, continuous shufflers, etc.). (Dkt. 115 at 8–9.) Having reviewed the voluminous record, the Court finds—with due regard to the well-presented argument by Defendants' counsel—that Plaintiffs' market definition is sufficient to reach a jury, especially in the light of direct evidence of monopoly power.

Defendants argue that Plaintiffs' economist, Dr. Kneuper, failed to perform a formal SSNIP test or quantitative analysis of cross-elasticities and instead "assumed" an all-shuffler market without rigorous validation. (Dkt. 115 at 11.) As the summary judgment record shows, Dr. Kneuper did rely in part on qualitative factors and industry testimony. (Dkt. 151 at 13.) But this is not a case where the market definition rests on pure say-so or an "ipse dixit" hunch. Plaintiffs have produced compelling direct evidence of Defendants' monopoly power in whatever reasonable

10

market is defined. *See Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000) (citing *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986) ("[T]he finding of actual, sustained adverse effects on competition . . . is legally sufficient to support a finding that the challenged restraint was unreasonable even in the absence of elaborate market analysis.")).

For two decades, Defendants have held an overwhelming share of sales and leases of casino-approved shufflers—approaching (and by some measures literally) 100%. Defendants' expert, Dr. Mark Israel, even stated that Defendant held a market share of "100% or very nearly all 100%" for automatic card shufflers made, sold, or leased to U.S. casinos in the last 20 years. (Dkt. 157 at 94 ¶ 4.) Defendants themselves concede that they had no significant price-constraining rivals. (Dkt. 129 ¶ 32 ("Theoretically, through our unique position in the [shufflers] market, we can set our prices to any level we feel appropriate.").) The few other companies that made attempts at selling shufflers were either sued by Defendants or bought out. (Dkt. 157 at 15 ¶ 15.)

Plaintiffs also present triable evidence that Defendants used sham patents to drive out competitors across the entire shufflers market. For example, Defendants' sham patent suit against VendingData's PokerOne shuffler (a "specialty" single-deck device) ultimately forced VendingData out of the market entirely, which meant all of VendingData's shuffler models (including a multi-deck batch model called the Random Ejection Shuffler) were removed from the market. (Dkt. 150 at 19; Dkt. 157 ¶¶ 15–16, 39, at 54 ¶ 51.) Absent Defendants' conduct, all of VendingData's shufflers

11

would have remained in the market competing in various segments.

Internal documents suggest Defendants' goal was to eliminate shufflers in general as a competitive threat, not merely one model. (Dkt. 129 ¶ 17.) And as Plaintiffs note, this worked. At least one foreign competitor, Taiwan Fulgent, was deterred from entering the multi-deck continuous shuffler market after seeing Defendants' aggressive litigation against VendingData, even though the VendingData litigation concerned a hand forming/specialty shuffler. (Dkt. 157 at 99 ¶ 23 ("The bottom line is we don't want to be like VendingData, we don't want to go bankrupt.").)

This nearly ubiquitous market control allowed defendants to price and develop their product line with an eye toward all devices. (Dkt. 129 ¶ 29) (Defendants considering whether to withdraw the specialty functions of the One2Six because it would "force customers to buy another, more expensive product" from Defendants). Indeed, Plaintiffs' statistician, Dr. Jamie McClave, calculated that Defendants were able to charge customers a 55% premium on *every* shuffler sold during the class period. (Dkt. 157 ¶ 2.)

In short, there is sufficient evidence in the record to support a jury finding that Defendants cornered the market on automatic card shufflers in U.S. casinos. In that scenario, the fine distinctions between subtypes of shufflers can become less important. If one supplier controls all meaningful supply of a category of products, that supplier's market power can be inferred without a detailed price-elasticity study. *See Toys "R" Us*, 221 F.3d at 937. As another judge noted in a previous case involving

12

the same Defendants, "where, as here, Plaintiffs have provided evidence to suggest that Defendants have literally cornered the relevant market on casino-grade automatic card shufflers in the United States, the economic analysis is simple: virtually all sales of casino grade shufflers in the United States trace back to Defendants." *TCS John Huxley Am.*, 2024 WL 1328710, at *8.

Plaintiffs' market definition is consistent with applicable Seventh Circuit precedent. Plaintiffs have produced triable evidence that Defendants have maintained virtually 100% control of all sub-categories of casino-grade shufflers for two decades, meaning practically that any price increase would endure based on the lack of meaningful substitutes. *Cf. Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464 (1992). Defendants hardly dispute this; they instead contend that Plaintiffs' arguments fail because they did not present a formal quantitative cross-elasticity study (SSNIP) between the relevant subcategories of shufflers. (Dkt. 115 at 13–16 (citing *Menasha Corp.*, 354 F.3d at 666–67).) True enough: but the evidence developed in discovery satisfies the purpose of a SSNIP analysis. More precisely, Defendants obtained patents on "all types of automatic shufflers in the United States" (Dkt. 157 ¶ 29) and are alleged to have acted unlawfully to exclude competitors from the market so that they could set "prices to any level we feel appropriate." (Dkt. 129 ¶ 32.)

When an antitrust plaintiff presents direct evidence of anticompetitive effects, it need only show the "rough contours" of a relevant market and that the defendant commands a "substantial share" of that market. *Republic Tobacco Co. v. N. Atl.*

13

*Trading Co.*, 381 F.3d 717, 737 (7th Cir. 2004). Plaintiffs here have introduced sufficient evidence to establish that the rough contours are all automatic shufflers.[1] In this posture, a formal SSNIP calculation is not required. *See Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 917 (7th Cir. 2020) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962)) ("The antitrust statutes require a 'pragmatic' and 'factual' approach to defining the . . . market."); *FTC v. Advoc. Health Care Network*, 841 F.3d 460, 468 (7th Cir. 2016) (quoting *Brown Shoe*, 370 U.S. at 336) ("The market must ' "correspond to the commercial realities" of the industry.' "); *Eastman Kodak*, 504 U.S. at 476 (recognizing "lock-in" where consumers are effectively captive to a seller for parts and service). As Plaintiffs point out, conducting a quantitative SSNIP here may not have been possible given the complete absence of competitive market data to draw. (Dkt. 157 ¶ 30.)

Defendants' enduring dominance and the absence of substitutes demonstrate monopoly power directly no matter which way the market definition is sliced amongst automatic shufflers. *Cf. Brown Shoe*, 370 U.S. at 327 (rejecting argument that the children's shoe market should be fragmented among boys and girls because the combined companies' market share was the same as it would be in any of the proposed submarkets). As a result, Plaintiffs have met their burden of proposing a relevant market and demonstrating market power. Accordingly, Defendants' motion for summary judgment on the issue of market definition and power is denied.

---

[1] Plaintiffs' expert opined (and Defendants did not meaningfully contest) that hand-shuffling is not an economic substitute for automatic shufflers because of regulatory and operational reasons (Dkt. 157 at 35 ¶ 31).

14

3.    *Issues of Fact Exist Regarding Antitrust Injury and Damages*

Defendants next contend that Plaintiffs have not presented sufficient evidence of antitrust injury or damages. (Dkt. 115 at 21.) In an antitrust case, Plaintiffs must show they were injured by the reduction of competition: for example, by paying higher prices for shufflers due to Defendants' conduct. *See Brunswick*, 429 U.S. at 489. Plaintiffs' theory of harm is that, but for Defendants' exclusionary tactics, competing shuffler suppliers would have entered the market, resulting in lower prices and better choices for casinos. (Dkt. 115 at 21.) In the actual world, because competitors were kept out, casinos paid monopoly prices and suffered a lack of innovation. To quantify this harm, Plaintiffs offer an expert damages analysis that uses economic modeling to estimate the overcharge (price difference between what was actually paid versus what Plaintiffs would have paid in a competitive market). (*Id.* at 22.)

Plaintiffs' experts employed a yardstick (benchmark) methodology. (*Id.* at 22–25.) Dr. Kneuper (economist) and Dr. Jamie McClave Baldwin (statistician) compare the shuffler market to two analogous product markets that were allegedly competitive: (1) the market for casino chip sorters ("chippers"), which are machines that sort poker chips (used at roulette tables); and (2) the market for intelligent shoes, which are electronic dealing shoes that read cards but do not shuffle (used in baccarat and other games). (*Id.*) They chose these yardsticks on the premise that the markets had multiple competing suppliers—or not a single dominant alleged monopolist. (*Id.*).

Dr. Kneuper opines that, in a "but-for world" with healthy competition, the automatic shuffler market would have experienced entry by at least a couple of competitors, driving down Defendants' profit margins to levels similar to those seen

15

in the chipper and intelligent shoe markets. (Dkt. 115 at 22.) Dr. Kneuper posits that Defendants' profit margins on shufflers would, in a competitive scenario, resemble the margins they actually earn on selling chippers and shoes (since Defendants also participate in those markets on a smaller scale). (*Id.*) Dr. Baldwin performed a regression analysis to measure the difference in Defendants' margins between shufflers and other product lines, corroborating the extent of the overcharge. (*Id.* at 22 n. 2.) Using these benchmarks, Plaintiffs' experts calculate substantial damages corresponding to the overcharge paid by Plaintiffs over the relevant period.

Defendants assail this damages model as speculative and unreliable. (Dkt. 115 at 21.) They argue that the yardstick comparators are not truly comparable in that the markets for chippers and shoes might have different demand characteristics or cost structures. (*Id.* at 23 n.3.) Defendants also dispute that those markets were fully competitive (they suggest those products are also niche and not perfectly analogous to shufflers). (Dkt. 176 at 18.) Defendants argue finally that Dr. Kneuper failed to identify specific would-be entrants and the timing of their hypothetical entry. (Dkt. 115 at 23–24.) According to Defendants, this renders Plaintiffs' but-for world too speculative.

Plaintiffs have presented sufficient evidence of antitrust injury and damages to proceed to trial. To begin, there is little doubt that the type of harm alleged, overcharge, is a classic antitrust injury. If Plaintiffs' allegations are true, then casinos have been paying monopoly prices for shufflers for years. More importantly, there is a genuine dispute of material fact as to injury and damages. Dr. Kneuper's analysis

16

establishes both antitrust injury and damages. This Court admitted Dr. Kneuper's testimony on both of these grounds in a previous *Daubert* ruling. (Dkt. 194 at 3.) Defendants argument that his methodology is unreliable and speculative are unavailing. (*Id.*) (Defendants' argument goes "far beyond the threshold question of whether Dr. Kneuper's conclusions are methodologically sound enough to go to a jury.")

Dr. Kneuper's and Dr. Baldwin's use of comparator markets and regression analysis, while subject to critique, provides a rational basis for a jury to estimate damages with a reasonable degree of certainty. As the judge in *TCS* explained regarding a similar argument Defendant offered in that case:

> Having played the same card regarding the same expert, Defendants get the same result. As before, the offered expert meets the minimal require[ment]s for admissibility under Rule 702, and "it will be for the jury to decide whether plaintiffs' contention regarding the sales they would have made but for defendants' conduct is sufficiently supported by the evidence to serve as a basis for a damage award."

*TCS John Huxley Am.*, 2024 WL 1328710, at *9. That reasoning is persuasive here.

Plaintiffs have chosen a recognized method—yardstick comparison—to approximate competitive prices. That method is legally acceptable, and Dr. Kneuper's testimony has already been permitted to pass through *Daubert*'s figurative gate. (Dkt. 194) (admitting Dr. Kneuper's testimony). Defendants will be able to cross-examine Dr. Kneuper's assumptions, but those points of attack will go to weight the factfinder should ascribe to his testimony, not whether there is a triable issue in the first place. Accordingly, the Court denies Defendants' motion for summary judgment on the issue of antitrust injury and damages.

### 4. *Combined Conduct (Monopoly Broth Doctrine)*

Defendants contend that Plaintiffs improperly combine conduct that, viewed in isolation, does not run afoul of antitrust laws into a "monopoly broth." (Dkt. 176 at 19.) Put differently, Defendants maintain that Plaintiffs cannot argue that the whole is greater than the sum of its parts. But liability under Section 2 turns on the totality of a monopolist's conduct, not on "dismembering" the case into isolated parts. *See Cont'l Ore*, 370 U.S. at 699. Courts therefore consider how discrete acts interact to maintain monopoly power. *See Mishawaka,* 616 F.2d at 986.

Plaintiffs present evidence of an integrated scheme that includes fraudulent procurement and enforcement of patents, exclusionary settlements or dealings, and shrewd acquisitions conducted in unison to ensure Defendants market dominance. (Dkt. 151 at 20–25.) The ultimate question is whether Defendants' overall conduct unreasonably excluded competition, and Plaintiffs may present the full picture. *See Cont'l Ore*, 370 U.S. at 699. To the extent Defendants seek summary judgment on the basis that Plaintiffs' combined-conduct theory fails as a matter of law, Defendants' motion is denied.

### 5. Walker Process *Fraud Claims*

A significant portion of this case centers on Plaintiffs' allegations that Defendants obtained certain shuffler patents through fraud on the PTO: specifically, by failing to disclose known material prior art, and in some instances by making affirmative misrepresentations about the novelty of their inventions. (Dkt. 1 ¶¶ 67–86.) Defendants seek summary judgment against these *Walker Process* fraud claims on multiple grounds. Defendants argue:

(i)     Plaintiffs lack a properly qualified technical expert to prove the materiality of the prior art (contending that Plaintiffs' expert Glenn May is not qualified as a person of ordinary skill in the art, or "POSA");

(ii)    Plaintiffs cannot show the required elements of materiality and intent to deceive for patents where invalidating prior art was later disclosed to the PTO in large disks;

(iii)    At least a subset of the patents (those applied for before 2004) should be kept out because there is no evidence Defendants knew of the key prior art (the Nicoletti, Luciano, and Roblejo devices) before those patents issued; and

(iv)    As to a few specific patents (the '014, '154, '248, '258, and '373 patents), Plaintiffs have effectively abandoned their fraud assertions or have no materiality evidence. (Dkt. 115.)

Each of these arguments is addressed in turn.

**(i) Qualifications of Plaintiffs' Technical Expert (Glenn May).** To prevail on *Walker Process* fraud, Plaintiffs must ultimately prove that the prior art in question was so material that the PTO would have denied or significantly limited the patent if it had known of it. *Walker Process*, 382 U.S. at 177. This inquiry often requires a showing that the prior art invalidates the patent claims (because of anticipation or obviousness). *See Therasense*, 649 F.3d at 1291–92.

In this case, Plaintiffs have proffered Glenn May as their technical expert to opine that various prior art devices anticipated or rendered obvious certain claims of

19

Defendants' shuffler patents, thus demonstrating the materiality of those references. (Dkt. 115 at 28.) Defendants attack Mr. May's qualifications, arguing that he is not a true "person of ordinary skill in the art" of card shuffler technology and thus cannot give reliable opinions on what the patents disclose or what the prior art teaches. (*Id.*) They emphasize that an expert who is not qualified in the pertinent art should not be permitted to testify on patent invalidity or materiality. (*Id.*) (citing *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1363–64 (Fed. Cir. 2008) (abuse of discretion to allow an unqualified expert to testify on patent invalidity)). Defendants filed a *Daubert* motion in parallel to exclude May entirely on these grounds, which this Court denied. (Dkt. 194 at 4–5.)

After careful review, the Court holds that May's qualification does not warrant summary judgment for Defendants. Even assuming that May's credentials are insufficient, Plaintiffs have marshaled enough evidence of materiality through multiple sources. For instance, the PTO, when presented with the Block '044 patent, determined that Block '044 invalidated two of Defendants' key patents (the '982 and '935 patents) on reexamination. (Dkt. 157 ¶¶ 10–11.) Expert testimony is not necessary to recognize the import of the PTO's action to the materiality question. *Cf. KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007) (courts may apply "common sense" in obviousness analysis). If a PTO examiner found the prior art destroys the novelty of the patent, then that prior art may be material. *Cf. Therasense*, 649 F.3d at 1291–92.

As for May's credentials, the Court has already rejected Defendants' argument

in its *Daubert* ruling and remains unconvinced that May is unqualified. (Dkt. 194 at 4–5) ("Mr. May studied automatic card shufflers in college, obtained a packaging science degree, and has over thirty years of industry experience relevant to how automatic card shufflers operate."). May's report (and supplemental "working papers") spans hundreds of pages of claim charts, indicating a detailed technical analysis of each allegedly anticipatory reference. (Dkt. 116 ¶ 50.) Defendants' attacks therefore go to weight, not admissibility.

Defendants assertions that May must be a POSA misconstrue the law. (Dkt. 115 at 28.) The determination of a person of ordinary skill in the art is itself a factual issue—a range of expertise can qualify. *Endress + Hauser, Inc. v. Hawk Measurement Sys. Pty. Ltd.*, 122 F.3d 1040, 1042 (Fed. Cir. 1997) ("The 'person of ordinary skill in the art' is a theoretical construct used in determining obviousness under § 103, and is not descriptive of some particular individual.").

At issue is whether a jury could find from the evidence that the patents were fraudulently procured; in short, it could. Defendants' request to short-circuit Plaintiffs' *Walker Process* claims for lack of a qualified expert is denied.

**(ii) Evidence of Materiality and Intent for the Shuffler Art Disks:** Defendants argue in the alternative that summary judgment is warranted as to certain patents. In particular, Defendants contend that there can be no *Walker Process* intent to deceive as to the '602, '791, '344, '576 and '535 patents (the "Shuffler Art Disk Patents"), all of which were issued after 2004. (Dkt. 115 at 35.) Defendants state they cannot, as a matter of law, be liable for fraud involving these Patents

because they submitted the prior art references to the PTO by eventually disclosing them in Information Disclosure Statements (IDSs). (*Id.*) The wrinkle is how they did so. In 2004–2007, amid litigation pressures, Defendants compiled thousands of pages of prior art documents onto CDs—referred to as the "Shuffler Art Disks"—and filed those disks with the PTO in several pending patent applications. (Dkt. 157 ¶ 52.)

Along with the disks, Defendants filed a "Special Notice" advising the PTO that the materials were being submitted due to litigation and that the PTO might not need to fully review them because they might not establish exact dates of prior public use. (Dkt. 157 ¶ 71.) The patent examiners initialed the IDS forms, indicating they at least nominally considered the submissions. (*Id.*) Defendants now contend that this disclosure of prior art via IDS insulates them from any *Walker Process* claim in that the disclosure show no intent to deceive. (Dkt. 115 at 35.)

Plaintiffs counter that Defendants' method of disclosure was itself deceitful. Plaintiffs maintain that Defendants buried material information in a mountain of data and simultaneously downplayed its significance. (Dkt. 151 at 34; Dkt. 157 ¶ 52.) In other words, by flooding the PTO with a large volume of documents without highlighting the crucial ones, and by suggesting in the notice that nothing in the submissions was definitively important, Defendants may have technically disclosed prior art but effectively ensured the examiners would not appreciate its import.

As the Federal Circuit has recognized, the manner in which information is presented can be misleading. An applicant who characterizes or contextualizes references in a way that leads the examiner to ignore them can be culpable. *See*

*Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1184 (Fed. Cir. 1995) (even when references are disclosed, burying the disclosures in a voluminous list can constitute inequitable conduct).

As the record here shows, Defendants' Special Notice stated that the material was submitted due to litigation, was voluminous, and that it might not establish prior art dates. (Dkt. 116-14 at 51–52.) Moreover, Defendants' submission was contrary to PTO guidelines, as it failed to highlight or identify material prior art.[2] An inference can be drawn that this signaled to the overburdened examiners[3] that they need not scrutinize the disks too carefully. Under this view, Defendants, acting contrary to PTO guidance, effectively dumped the data on the PTO without guiding the examiners to the material prior art.

If Plaintiffs' version is credited, Defendants essentially buried a needle in a haystack. The *TCS* court agreed in denying summary judgment on this precise issue, noting that the method of disclosure created a genuine issue of material fact as to both materiality and intent to deceive. *TCS John Huxley Am.*, 2024 WL 1328710, at *12. That reasoning is persuasive: Defendants cannot rely on disclosure if the disclosure was executed in a manner that was itself misleading or incomplete.

---

[2] (*Id.* at 54 n. 57) (citing MPEP 2004 ¶ 13 ("It is desirable to avoid the submission of long lists of documents if it can be avoided. Eliminate clearly irrelevant and marginally pertinent cumulative information. If a long list is submitted, highlight those documents which have been specifically brought to applicant's attention and/or are known to be of most significance.")).

[3] (*Id.* at 54) (Plaintiffs' expert Godici, a former director of the PTO, opining that "[i]n my experience the PTO's consideration of this CD may have been limited by the resources available.")

In short, with respect to the Shuffler Art Disk Patents and post-2004 disclosures, the Court finds sufficient evidence from which a jury could infer both an intent to deceive and materiality. As a result, summary judgment is denied as to whether Defendants' later-issued patents are free of inequitable conduct.

**(iii) Fraud Claims on Pre-2004 Patents and Defendants' Knowledge (Nicoletti, Luciano, Roblejo).** Defendants next seek partial summary judgment as to five patents—the '096, '684, '750, '751 and '982 patents—that were prosecuted and issued before 2004 (before the above-mentioned IDS filings). (Dkt. 115 at 31.) Defendants argue that there is no evidence they were aware of the key prior art prototypes (the Nicoletti device, the Luciano device, and the Roblejo device) at the time they were prosecuting those early patents. (*Id.*) If Defendants did not know of a reference, they could not intentionally deceive the PTO by failing to disclose it. Plaintiffs oppose this conclusion, pointing out evidence that Defendants knew about Roblejo's shuffler, knew it was material, and failed to disclose it to the PTO for each patent. (Dkt. 151 at 29–31.)

Defendants' motion regarding the '751, '096, and '982 patents must be denied. Plaintiffs present evidence for the '751 and '096 patents that Defendants knew about the Roblejo '122 patent, knew it was material, and failed to disclose it to the PTO during prosecution of both patents. (Dkt. 157 ¶ 27.) Plaintiffs also show that Defendants knew about the Block '044 patent, knew it was material to the '982 patent, and failed to disclose it to the PTO. (Dkt. 157 ¶ 13). Defendants do not even contest this in their reply brief. *See generally* (Dkt. 176.) As such, a reasonable juror

could infer materiality and fraudulent intent for the '982, '751, and '096 patents.

That leaves the '750 and the '684 patent. Defendants disclosed the Roblejo '122 patent in the prosecution history of both the '750 and '684 patents (Dkt. 157 ¶¶ 30–31), so this cannot be grounds for Plaintiffs *Walker Process* claims. Instead, Plaintiffs premise their evidence on a Roblejo Shuffler prototype premiered at a trade show in 1997, which both parties agree is different prior art then the Roblejo '122 patent. (Dkt. 176 at 25.)

It is undisputed that Defendants (specifically, some Shuffle Master representatives, including Attila Grauzer and Jennifer Farrar) attended a 1997 gaming expo where the Roblejo prototype was demonstrated. (Dkt. 176 at 24 n. 12.) Plaintiffs then present evidence of an internal memo and testimony that Defendants looked at the Roblejo device at the expo and were given a brochure. (Dkt. 151 at 31.) Farrar herself admitted she went to the expo to monitor competitors and that she received Casino Concepts' brochure. (*Id.*) Knowledge of the Roblejo device's existence in 1997 can therefore be established. But as the *TCS* court found, there was no clear evidence anyone at Shuffle Master realized that the Roblejo shuffler had a specific feature (the automatic moving cover) that was material to the patent claims. *TCS John Huxley Am.*, 2024 WL 1328710, at *11.

Similar deficiencies exist in the record of this case, but it is not necessary to address every detail. It suffices that Plaintiffs have no solid evidence showing that, as of 1998–2000, Defendants were subjectively aware that Roblejo's prototype invalidated their pending claims. They knew of the device generally, but the record

25

does not permit a reasonable inference that Defendants appreciated its material features.[4] In fact, Defendants internal report after the expo did not mention the critical features (it only attached the brochure and made generic notes). (Dkt. 151 at 31.) Given this, the Court agrees that no reasonable jury could find that Defendants intentionally deceived the PTO for the prosecution of the '684 and '750 patents by omitting the Roblejo reference. At most, one could say they were negligent in not investigating further, but negligence is not enough for *Walker Process* fraud.

The Nicoletti and Luciano prototypes present an even more pronounced lack of evidence. The Nicoletti device was developed in 1985 while the Luciano device was created in 1992–1993 (Dkt. 157 ¶¶ 53, 55.) There is virtually no evidence that anyone at Shuffle Master even knew about Nicoletti's 1985 machine until many years later when it surfaced in litigation. (*Id.* ¶ 54.) The record indicates the Nicoletti device was briefly displayed in Atlantic City in 1990, but there is no evidence that Defendants knew anything about it, let alone observed it. (Dkt. 116 ¶ 53.)

Moreover, Plaintiffs have effectively conceded they cannot prove intent as to the Luciano prototype. (Dkt. 176 at 23 n. 11.) That device was briefly displayed in a sales video in 1993–1994, but again, Plaintiffs present no evidence that Defendants even watched the video. (Dkt. 157 ¶ 55.) For the '750 and '684 patent, therefore, Plaintiffs have no triable evidence of intentional fraud.

---

[4] Features of the Roblejo prototypes material to the '750 and '684 patent were located on the interior of the prototype. (Dkt. 116 ¶ 65.) Plaintiffs present evidence that there was a transparent side (Dkt. 157 ¶ 59) but present no evidence (beyond speculation) that establishes Defendants saw any of these material features, let alone appreciated them.

For these reasons, Defendants are entitled to summary judgment on Plaintiffs' *Walker Process* allegations of fraud in the procurement of the '684 and '750 patents. But Defendants' motion is denied as to the '982, '751, and '096 patents.

**(iv) Lacking Materiality Evidence for Certain Patents ('014, '154, '248, '258, '373).** Defendants argue finally that Plaintiffs have abandoned or cannot support any *Walker Process* theory as to five other patents: U.S. Patent Nos. 6,254,014; 6,655,154; 7,077,248; 6,149,258; and 6,254,373 (the '014, '154, '248, '258, and '373 patents). (Dkt. 115 at 34.)

Defendants point out that Plaintiffs' technical expert (May) did not offer any opinions on materiality or invalidity of the '154 and '248 patents. Instead, Plaintiffs attempted to cover those via Godici's testimony and by incorporating an earlier analysis from Dr. Joel Greenberg. (*Id.*) Defendants argue this is either insufficient or improper. As for the '014, '258, and '373 patents, Defendants note that Plaintiffs' complaint and briefing barely mention any misrepresentation specific to those patents. Defendants thus surmise that Plaintiffs have dropped their claims as to those patents.

Plaintiffs, in response, clarify that they are not pursuing separate fraud claims on the '014, '258, or '373 patents in isolation. Rather, they assert that those patents were part of Defendants' overall anti-competitive scheme. (Dkt. 151 at 37.) This ties more into the sham litigation and "monopoly broth" theory than *Walker Process*. Given that understanding, the Court will grant Defendants' summary judgment motion for any *Walker Process* claim based on the '014, '258, or '373 patents.

27

Summary judgment on the '154 and '248 patent claims, however, is not warranted. This Court has already ruled that portions of Godici's expert report are admissible and rejected Defendants' argument that reliance on Greenberg's earlier testimony is improper. (Dkt. 194 at 5–6.) More importantly, the portions that are admissible speak directly to the materiality of prior art for both the '154 and '248 patents. (Dkt. 116-4 ¶¶ 260–264, 272–278.) As such, Godici's testimony and reliance on Greenberg's earlier technical assessments creates a triable issue on materiality.

Based on the foregoing, the Court grants summary judgment as to Plaintiffs' *Walker Process* claims based on the '014, '258, and '373 patents but denies summary judgment as to the *Walker Process* claims based on the '154 and '248 patents.

### 6. Sham Litigation (Noerr-Pennington *Immunity and Exception*)

Defendants move for summary judgment on Plaintiffs' sham litigation theory, arguing that their patent infringement lawsuits against competitors were not objectively baseless and thus are immune under *Noerr-Pennington*. (Dkt. 115 at 29.) Now that the Court has held a trial-worthy issue exists on the fraud and invalidity of several patents, it follows that the sham litigation claim must also go to the jury. If the jury finds that Defendants obtained patents by fraud and then immediately used those patents to sue competitors, it could conclude those suits were objectively baseless. *See PRE*, 508 U.S. at 60–61.

At this stage, the Court must view the evidence in Plaintiffs' favor. Doing so, the Court finds that Plaintiffs have raised a triable issue that Defendants' patent litigation campaign was a sham exception to *Noerr-Pennington*. Defendants' motion

tried to bootstrap the sham claim's fate to the *Walker Process* claim. (Dkt. 115 at 29.) Since the *Walker Process* claim largely survives, the sham claim does too. Defendants motion for summary judgment on the sham litigation issue is therefore denied.

### B.  Plaintiffs' Motion for Partial Summary Judgment Is Denied

Plaintiffs have moved for partial summary judgment on four issues. They ask the Court to rule that, as a matter of law: (1) Defendants are judicially estopped from disputing antitrust impact; (2) Defendants are judicially estopped to dispute the relevant market as the United States market for automatic card shufflers; (3) Defendants are judicially estopped to dispute that they possessed monopoly power in that market; and (4) there is no genuine dispute that the "Nicoletti Shuffler" was sold more than one year before the filing dates of the patents at issue, thus satisfying the "on-sale bar" under 35 U.S.C. § 102(b). (Dkt. 131 at 6.)

When evaluating assertions of judicial estoppel, courts must apply a flexible equitable doctrine to consider whether a party seeks to manipulate the courts by asserting inconsistent positions in different proceedings. As the Seventh Circuit has explained, three general factors guide the judicial estoppel analysis: (1) the later position must be "clearly inconsistent" with the earlier position; (2) the party must have succeeded in persuading a court to accept the earlier position, such that acceptance of an inconsistent position in a later case would create the perception that either court was misled; and (3) the party would derive an unfair advantage or impose an unfair detriment if not estopped. *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 795 (7th Cir. 2013) (citing *New Hampshire v. Maine*, 532 U.S. 742, 750–

29

51 (2001)).

Having carefully reviewed the parties' briefs and evidentiary submissions, the Court denies the Plaintiffs' motion in full. Plaintiffs' arguments, and the Court's reasoning, are addressed in order below.

> 1. *Judicial Estoppel on Antitrust Impact/Causation is Improper Because the Issue Was Not Relied Upon by a Previous Court Order*

Plaintiffs first argue Defendants should be estopped to dispute that their exclusionary litigation caused competitive harm. (Dkt. 131 at 6.) They point to Defendants' 2003 *CARD v. Shuffle Master* filings, which asserted that CARD's entry would permanently damage the "premium" market, alter industry "metrics," and lower prices (Dkt. 128 at 11). A Nevada state court granted a preliminary injunction in favor of Defendants, finding irreparable harm and inadequate monetary damages (*id.* at 12.)

Although Plaintiffs demonstrate that there is some tension between Defendants' earlier arguments and their present claim that no competitive harm occurred, the second estoppel factor is dispositive. Judicial estoppel requires that a previous court have accepted the position presently being contradicted. *Grochocinski*, 719 F.3d at 795; *In re Airadigm Commc'ns, Inc.*, 616 F.3d 642, 662 (7th Cir. 2010). But in 2003, Federal Circuit law presumed irreparable harm upon a strong showing of infringement. *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 974–75 (Fed. Cir. 1996); *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1149 (Fed. Cir. 2011). The Nevada order simply found likelihood of success for infringement and then recited irreparable harm, so the injunction could just as easily have rested on the

presumption (Dkt. 153 at 13).

As a result, Plaintiffs have not demonstrated that the Nevada court clearly accepted Defendants' factual assertions about market harm, rather than applying the then-controlling presumption of irreparable harm. Without that judicial acceptance, estoppel does not apply. Plaintiffs' motion to apply judicial estoppel as to antitrust impact and causation is therefore denied.

2. *Judicial Estoppel on Market Definition Is Denied Because It Was Neither Litigated Nor Relied On*

Plaintiffs argue that Defendants should be estopped to dispute that the relevant market is the U.S. market for automatic shufflers. (Dkt. 131 at 6.) They note that, in earlier patent suits, Shuffle Master described itself as having "pioneered the market," accused CARD of "poaching the U.S. market for shufflers," and called itself the "market leader" with the right to exclude others (Dkt. 128 at 11, 17–18; Dkt. 170 at 11, 15, 20). They assert that in later cases, Defendants again spoke of "the U.S. market [Shuffle Master] built" and warned that rivals had "no right to permanently change the metrics of the U.S. market" (Dkt. 128 at 22). Plaintiffs say these statements confirm Defendants themselves defined the market broadly, and that their claims of exclusivity and premium pricing amount to direct evidence of monopoly power under *du Pont*, 351 U.S. at 391–92 (Dkt. 128 at 13–17; Dkt. 170 at 11, 20).

Defendants respond that these references were rhetoric in patent disputes, not admissions of an antitrust market. (Dkt. 153 at 17.) *CARD*, they note, was about infringement, not monopolization, and it did not involve the economic analysis needed

31

to define a relevant market (*Id.* at 11–14, 18–20). Defendants also assert that courts have long held that casual business references to "markets" do not establish a Sherman Act market. *See Brown Shoe*, 370 U.S. at 325; *Republic Tobacco*, 381 F.3d at 737. On this view, estoppel cannot be used as a shortcut to relieve Plaintiffs of the burden of proving market definition (*Id.* at 13, 18–20).

Defendants correctly argue that judicial estoppel does not apply to this circumstance. At issue in the 2003 *CARD* case was patent infringement, not monopolization; none of the parties argued about whether hand-dealt games constrain automatic shufflers or whether batch, continuous, and specialty devices belong to a single interchangeable space (Dkt. 153 at 18–20). Courts have long warned that business references to a "market" do not, standing alone, establish a Sherman Act "relevant market." *Brown Shoe*, 370 U.S. at 325; *Republic Tobacco*, 381 F.3d at 737. Such statements may be useful context for how a firm viewed its competitors, but they cannot replace the economic analysis antitrust law demands (Dkt. 153 at 13). By the same token, the Nevada court's injunction never identified or analyzed an antitrust market. Market definition was irrelevant to that proceeding, and the order did not adopt any such finding (Dkt. 158 at 16, 22). For these reasons, therefore, Plaintiffs' motion to judicially estop Defendants to dispute the relevant market is denied.

3.    *Judicial Estoppel on Market Power Is Denied Because the Issue Was Not Relied Upon by Previous Court Order*

Plaintiffs ask the Court to estop Defendants to deny the existence of monopoly power, citing earlier statements where Shuffle Master described its "exclusive

32

position," warned that CARD's low-price entry would undercut its "premium" pricing, and emphasized that requiring casinos to return to higher prices "is not a reliable business option" (Dkt. 131 at 17–20). They also highlight that Shuffle Master never licensed its patents and at times held nearly the entire U.S. shuffler market, which Plaintiffs argue is direct evidence of monopoly power under *du Pont*, 351 U.S. at 391–92.

Defendants respond that such rhetoric was advocacy in a patent case, not an admission of legal monopoly power. (Dkt. 153 at 25.) Describing oneself as a "pioneer" or warning of harm from a competitor does not equal conceding the power to control prices market-wide. (*Id.*) They note that high prices alone do not prove monopoly power, *Marshfield Clinic*, 65 F.3d at 1412, and that monopolization claims generally require defining a relevant market and proving share, not simply relying on earlier statements (Dkt. 153 at 23–24.)

As with Plaintiffs' other requests, judicial estoppel on this point is not appropriate. Defendants' cited statements are suggestive but not clear admissions of monopoly power, defeating the first estoppel factor. More importantly, the *CARD* court never found Shuffle Master to be a monopolist. Instead, its injunction arguably relied on patent infringement and a then-existing presumption of irreparable harm (*see infra* at Section III.B.1), not on market power, which defeats the second factor (Dkt. 158 at 16, 22); *Bosch*, 659 F.3d at 1149. Accordingly, Plaintiffs' motion to apply judicial estoppel as to monopoly power is denied.

33

    *4.    A Genuine Dispute of Material Fact Exists On Whether the Nicoletti Shuffler Triggered the On-Sale Bar*

Plaintiffs asked the Court to rule, before trial, that four of Defendants' patents are invalid under the pre-America Invents Act ("AIA") on-sale bar. (Dkt. 131 at 6.) Their argument is that inventor Adolph Nicoletti had already sold his earlier automatic card shuffler years before these patents were filed. (*Id.* at 23–26.) In 1995, Nicoletti (through his company, We Are 21) signed an Asset Purchase Agreement (APA) with Casino Concepts, transferring all rights to his shuffler project for $10,000. (*Id.* at 25.) Because the deal happened more than a year before the earliest patent filing, Plaintiffs argue it qualifies as an invalidating "on sale" event under *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67–68 (1998), which requires (1) a commercial offer for sale; and (2) that the invention was "ready for patenting." Plaintiffs say the inclusion of prototypes in the sale and earlier patents show the invention was reduced to practice and "ready for patenting." (Dkt. 131 at 27.)

Defendants reject that contention and argue that the 1995 deal was not a product sale at all, but only a transfer of intellectual property. (Dkt. 153 at 30.) Defendants note the $10,000 sale price came from an appraisal of patent assets, not a shuffler machine, and they emphasize that Nicoletti's shuffler had failed a 1990 casino field trial and was labeled "unproven." (*Id.* at 28.) Defendants rely on *Elan Corp. v. Andrx Pharms., Inc.*, 366 F.3d 1336, 1341 (Fed. Cir. 2004), which holds that selling patent rights is not the same as selling an invention. On the second prong ("ready for patenting"), Defendants argue that Plaintiffs never did the required claim-by-claim comparison to show Nicoletti's prototypes actually contained all the features

of Defendants' later patents or that they worked for their intended purpose, as required by *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 996–97 (Fed. Cir. 2007). (Dkt. 153 at 31–32.)

Defendants are correct that factual disputes prevent summary judgment on this point. It is undisputed that Nicoletti transferred his rights and prototypes to Casino Concepts in 1995, well before the patents' critical dates. But whether that deal counts as a "commercial sale of the invention" is unclear. On one hand, the included prototypes suggest something tangible was sold. On the other, the appraisal focused on patents, the prototypes were considered "unproven," and the deal looked more like a technology handoff than a sale of a finished machine. (Dkt. 154 ¶ 28.) And although Plaintiffs argue the prototypes and Nicoletti's earlier patents prove the invention was ready for patenting, Defendants have raised valid questions about whether those prototypes actually embodied all the later-claimed features and whether they worked reliably. (Dkt. 153 at 31–32.) Without a detailed claim-by-claim analysis, and in view of the conflicting evidence, the Court cannot say as a matter of law that the patents are invalid. Summary judgment on whether the Nicoletti Shuffler triggered the on-sale bar under 35 U.S.C. § 102(b) is denied.

### C.    Plaintiffs' Motion for Class Certification Is Granted

Plaintiffs seek to certify a class of "all persons and entities" that "directly purchased or leased automatic card shufflers within the United States" from Defendants from April 1, 2009 to December 31, 2022 under Rule 23(b)(2) (injunctive relief) and 23(b)(3) (damages) of the Federal Rules of Civil Procedure. (Dkt. 120.)

35

Defendants oppose class certification on the grounds that Plaintiffs cannot satisfy the typicality requirement of Rule 23(a)(3) and cannot show predominance under Rule 23(b)(3). (Dkt. 148 at 6.) These arguments are addressed in turn.

*Legal Standard*

Neither party disputes the basic requirements of class certification here. Plaintiffs' proposed class must first meet "the Rule 23(a) requirements of numerosity, typicality, commonality, and adequacy of representation." *Arandell Corp. v. Xcel Energy Inc.*, 149 F.4th 883, 891 (7th Cir. 2025). Although the parties do not dispute many of the Rule 23(a) requirements, this Court must still conduct "a rigorous analysis" and assure itself that each of "the prerequisites' for class certification have been met." *Id.* at 892 (citing *Bell v. PNC Bank, N.A.*, 800 F.3d 360, 373 (7th Cir. 2015) (cleaned up)). If those requirements are met, the class "must then fit into one of three categories under Rule 23(b)." *Id.* For a damages class under Rule 23(b)(3), as Plaintiffs seek here, "a court must find 'that the questions of law or fact common to class members predominate over any questions affecting only individual members . . . .' " (citing Fed. R. Civ. P. 23(b)(3)).

    1.    *Numerosity*

Rule 23(a)(1) is satisfied if the class is so numerous that joinder of all members would be impracticable. In this case, the proposed class encompasses casinos and other gaming entities across the country that purchased or leased Defendants' card shufflers over a 13-year period. (Dkt. 123 at 7–8.) Plaintiffs estimate the class includes hundreds of purchasers, ranging from major Las Vegas casino chains to regional casinos like the Plaintiffs. (*Id.* at 36.) Defendants do not dispute numerosity,

and the Court finds this requirement met given the geographically dispersed and likely numerous class members. Joinder of all such entities would be impracticable, if not impossible.

### 2. *Commonality*

Rule 23(a)(2) requires "questions of law or fact common to the class," and even a single significant common question will do. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011). Commonality present a low hurdle to certification. *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014). Plaintiffs identify multiple common questions, including: whether Defendants engaged in an overall scheme to acquire or maintain monopoly power in the automatic shuffler market; whether Defendants' conduct (e.g. fraudulent patent procurement and sham litigation) was anticompetitive and violated §2 of the Sherman Act; whether that conduct had the effect of suppressing competition and raising shuffler prices above competitive levels; and the nature of relief to which the class is entitled. (Dkt. 123 at 17.) Each of these issues is common to all class members, as their claims all arise from the same alleged course of conduct and legal theory of monopolization. Defendants do not seriously contest commonality, and the Court finds this element satisfied. The existence of an overarching monopolization scheme affecting all class members is a typical common question that can be resolved with classwide evidence.

### 3. *Typicality*

Rule 23(a)(3) requires that the class representatives' claims be typical of those of the class. Defendants argue that, because Plaintiffs are small operations with limited purchasing history compared to other proposed class members (including

37

some of the largest casino operators in the country), Plaintiffs' claims cannot be typical. (Dkt. 148 at 15.) According to Defendants, the named Plaintiffs used only one category of shufflers (multi-deck batch shufflers) and, even then, infrequently. (*Id.*) For example, Casino Queen Marquette has not bought or leased any new shuffler since 2010. (*Id.* at 6.) Neither Plaintiff has ever used a continuous shuffler, yet roughly half of blackjack tables in Las Vegas use continuous shufflers. (Dkt. 116-4 at 71:20–72:6.) Defendants maintain this "mismatch" defeats typicality. (Dkt. 148 at 15.) They liken it to "a local retail store that ships four packages every five years to represent Amazon in a dispute," which "obviously makes no sense." (*Id.* at 1.)

These differences in size, purchasing volume, and product mix between the Plaintiffs and some absent class members must be conceded. But having carefully considered the evidence and applicable precedent, the Court finds that these differences do not preclude a finding of typicality in this antitrust context.

Typicality does not require the named plaintiffs' circumstances to be identical to every class member. It is satisfied when their claims "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members" and rest on the same legal theory. *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992) (citing *De La Fuente v. Stokely–Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)). All purchasers here, whether they bought two shufflers or two hundred, allege injury from the same monopolization scheme that inflated shuffler prices by suppressing competition. (Dkt. 123 at 18.) Each claim thus turns on the same course of conduct and its price effects.

38

Courts regularly hold that even substantial factual differences in volume, bargaining leverage, or product subtype do not defeat typicality where the nature of the antitrust claim is uniform across the class. *See, e.g., In re Bromine Antitrust Litig.*, 203 F.R.D. 403, 409–10 (S.D. Ind. 2001) (rejecting argument that a "small and specialized" purchaser was atypical because defendants' alleged price-fixing created "the same claim for all" buyers); *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815–16, 819 (7th Cir. 2012) (variations in impact and damages do not defeat certification where liability turns on the same alleged anticompetitive conduct).

Defendants' specific arguments do not compel a contrary finding. To begin, Plaintiffs' failure to use every shuffler model is not disqualifying. Typicality does not require the representative to have purchased each product variation so long as the same challenged conduct applies across the line. *See Moehrl v. Nat'l Ass'n of Realtors*, No. 19-cv-1610, 2023 WL 2683199, at \*26–27 (N.D. Ill. Mar. 29, 2023) (rejecting typicality challenge when plaintiffs listed homes on only five of twenty listings because "all Covered MLSs implemented the Challenged Restraints") (citations removed). As the record here reflects, Defendants dominated each automatic-shuffler category during the class period. (Dkt. 157-23 at 16) ("Defendants charged [supracompetitive] prices . . . on every shuffler it sold during the class period.") As a result, a purchaser who used only batch shufflers can still be typical of purchasers who also used continuous shufflers because both assert injury from the same alleged monopolistic pricing regime. *See Moehrl*, 2023 WL 2683199, at \*12 (citing *In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. 154, 168 (S.D. Ind. Sept. 9, 2009)).

39

Second, differences in demand profile or casino characteristics do not render Plaintiffs atypical. *Rosario*, 963 F.2d at 1018 (typicality does not turn on identical purchasing patterns). Larger casinos may rely more heavily on automatic shufflers, while some regional casinos do so less heavily, but that fact goes to the extent of the impact rather than the nature of the claim. *See Messner*, 669 F.3d at 815–16, 819 (variations in impact and damages do not defeat class certification where liability turns on common conduct). Both allege injury from paying supercompetitive prices.

Third, and likewise, Defendants' argument that larger casinos may have paid lower prices after negotiation goes more to damages than to the nature of the claim.[5] *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656–57 (7th Cir. 2002). Even with individualized negotiations, Plaintiffs may show classwide impact by proving that the minimum bargaining floor was higher than it would have been absent the challenged conduct. *Id.* Plaintiffs have done so. According to Plaintiffs' expert, Dr. Jamie McClave Baldwin, Defendants charged significantly higher prices on *every* shuffler it sold during the class period: up to 55% higher for sales and 38% higher for leases. (Dkt. 157-23 at 15–16). Simultaneously, sales personnel could only offer price deviations of "5 to 10 percent." (Dkt. 172-1 at 176:15–179:8) (Testimony of Defendants' Vice-President).

---

[5] Defendants' reliance on *In re Graphics Processing Units (GPU) Antitrust Litigation*, 253 F.R.D. 478 (N.D. Cal. 2008), is misplaced. In *GPU*, roughly 99.5% of sales were to large wholesalers under highly individualized contracts, while the proposed representatives were single-purchase retail consumers. *Id.* at 489–90. As the court there held, this amounted to a fundamental mismatch because evidence of retail injury did not necessarily bear on the highly individualized wholesale contracts. *Id.* at 496. In this case, however, all class members are direct purchasers of automatic shufflers.

### 4. *Adequacy*

Rule 23(a)(4) requires for certification of a class that the proposed representatives be able to fairly and adequately protect the class, which turns on two questions: whether the named plaintiffs have no conflicts and will prosecute the case, and whether counsel is qualified and capable. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997); *CE Design Ltd. v. King*, 637 F.3d 721, 724 (7th Cir. 2011); *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 598 (7th Cir. 1993). Defendants do not contest adequacy. Meanwhile, the record shows aligned interests. All class members seek relief for the same alleged overcharge, and differences in product type do not create a disabling conflict. *Messner*, 669 F.3d at 815–16. The named plaintiffs have litigated vigorously, and counsel meets Rule 23(g)'s qualifications. *See* Fed. R. Civ. P. 23(g)(1)(A).

In sum, Plaintiffs have demonstrated adequacy. There is no evidence of disabling conflicts with the class, and they (along with their attorneys) have shown the willingness and ability to prosecute this action on behalf of the class. All Rule 23(a) prerequisites are therefore satisfied.

### 5. *Rule 23(b)(2) Injunctive Relief Class*

Plaintiffs seek to certify a Rule 23(b)(2) class for injunctive and declaratory relief. Under Rule 23(b)(2), certification is appropriate if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). This provision is typically satisfied when a single injunction would provide relief to each class member. *Jamie S. v. Milwaukee Public*

*Schools*, 668 F.3d 481, 499 (7th Cir. 2012). Plaintiffs invoke Section 16 of the Clayton Act and request class-wide injunctive relief to halt Defendants' alleged anticompetitive practices and to remove barriers to competition. (Dkt. 123 at 19–20.)

Defendants do not seriously contest a Rule 23(b)(2) class under its enumerated grounds. Instead, they argue that certification is improper because there is a "lack of typicality." For the reasons discussed above, the Court disagrees with Defendants' position. All the same, the criteria for a Rule 23(b)(2) class are met. By its very nature, Defendants' alleged monopolization scheme was conducted on grounds generally applicable to all class members: namely, excluding competitors and controlling prices in the automatic shuffler market. If Plaintiffs prevail on the merits, an injunction prohibiting Defendants from engaging in such conduct would benefit the entire class at once. Each class member faces the same ongoing harm of a monopolized market with limited choices, and the relief sought—opening the market to competition— would be generally applicable. (Dkt. 123 at 19–20.) Accordingly, certification under Rule 23(b)(2) is granted. Because any injunctive relief would apply classwide, this Rule 23(b)(2) class will consist of the same members as the proposed damages class discussed below.

### 6.     *Rule 23(b)(3): Predominance*

Plaintiffs separately seek certification under Rule 23(b)(3) to recover damages on behalf of the class. Rule 23(b)(3) has two main requirements: predominance and superiority. These requirements are designed to ensure that a class action will be an efficient and fair means of resolving the controversy. Defendants vigorously contest predominance (but not superiority), so the following analysis turns first to

predominance.

The predominance inquiry tests whether proposed classes are "sufficiently cohesive to warrant adjudication by representation" and is "far more demanding" than commonality. *Messner*, 669 F.3d at 814 (citations omitted). Courts must consider all factual or legal issues that will need to be resolved and determine whether common issues "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Importantly, predominance is not a numeric test of counting issues; it turns on the centrality of common questions. *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014) (predominance is "qualitative rather than [] quantitative" and is not decided by "counting noses"). In an antitrust monopolization case, the central common issues typically include: (1) the defendant's alleged anticompetitive conduct and whether it violated antitrust law; (2) the existence of a causal link between the conduct and harm to the class; and (3) the measure of damages attributable to the conduct. If those central issues can be established through evidence common to the class, and if individual variations are limited to peripheral matters (like the precise amount of each class member's damages), then common issues predominate.

**Predominance of Antitrust Liability:** There is not significant debate between the parties that numerous antitrust liability questions are common and predominate. Whether Defendants engaged in a willful scheme to monopolize the automatic shuffler market in violation of Section 2 of the Sherman Act is a question common to all class members and is the linchpin of the case. This overarching

43

question will be answered using evidence that applies classwide: for example, evidence of Defendants' patent prosecution conduct, their litigation history against various would-be competitors, internal communications about competitive strategy, and economic evidence of market structure. (Dkt. 123 at 24–28.) These facts do not vary from customer to customer. They concern Defendants' conduct and the state of the market as a whole. Common issues of the existence of the monopolization scheme and its wrongfulness thus predominate.

Defendants tacitly concede that the fact of their conduct can be shown commonly. Defendants instead save the bulk of their energy to argue that the impact of that conduct, the resulting damages, and the statute of limitations raise intractable individual issues not amenable to class treatment. (Dkt. 148 at 14.)

**Predominance of Antitrust Impact (Injury)**: In an antitrust class action, antitrust impact means proof that the defendant's conduct harmed the class members in a common manner. *Messner*, 669 F.3d at 815. One example, applicable here, would be causing class members to pay higher prices for a product than they would have in a competitive market. Plaintiffs must demonstrate that the element of antitrust impact is capable of proof at trial through evidence common to the class, rather than individual to each member. *Id.* This does not mean Plaintiffs must prove actual injury to each class member at this stage. Rather, they must show a feasible common method for establishing that the monopolistic conduct had a classwide effect on prices. *Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 922, 927 (7th Cir. 2016) (plaintiffs must propose common evidence or a common method to demonstrate

44

common impact).

Plaintiffs have met that burden. First, Plaintiffs put forward market evidence that indicates the automatic shuffler market was conducive to common impact. During the class period, Plaintiffs contend, Defendants enjoyed an extremely high market share (approaching 100% in some segments) and substantial profit margins. (Dkt. 157 ¶ 4; Dkt. 129 ¶ 32) ("Theoretically, through our unique position in the [shufflers] market, we can set our prices to any level we feel appropriate.") And Defendants raised barriers to entry through aggressive litigation tactics premised on fraudulently obtained patents. (Dkt. 157 ¶ 37.) Such conditions are hallmarks of monopolization that make it likely that the absence of competition would have been felt by all customers in the form of higher prices. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464 (1992) (dominant market share and barriers to entry permit inference of power to raise prices).

Most significantly, Plaintiffs offer expert economic analysis to establish common impact. Plaintiffs' economic expert, Dr. Baldwin (with input from industry expert Dr. Kneuper), performed a yardstick and multiple regression analysis to estimate how shuffler prices during the class period compared to competitive benchmark prices. (Dkt. 126-18.) Using data on Defendants' shuffler sales and pricing, Baldwin's regression model purports to isolate the effect of Defendants' monopoly conduct on prices, controlling for other factors. (*Id.* at 6.) Baldwin ultimately calculated a classwide overcharge percentage: essentially the percentage by which Defendants' prices were elevated due to lack of competition. (*Id.*) This

45

overcharge rate, in her opinion, is common to the class and all or nearly all class members paid 55% more for shufflers than they would have in a but-for competitive world. (*Id.* at 54.)

Courts have long recognized that regression analyses and other econometric methods can serve as common proof of impact and damages in antitrust cases. *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d at 655–56 (a cartel may be shown to have raised the baseline price across transactions, provable through statistical analysis). If Baldwin's analysis is valid, it would demonstrate on a classwide basis that Defendants' conduct caused every class member to pay a higher price than they should have.

Defendants assail Plaintiffs' common proof of impact on several fronts, but none of their arguments defeats a finding of predominance. Defendants' primary contention is that the impact of the alleged conduct varied depending on shuffler type and timing, such that one cannot presume all class members were affected. (Dkt. 148 at 9.) They note that Plaintiffs' theory spans "more than a dozen patents and half a dozen different alleged sham litigations" involving different shuffler models at different times. (*Id.* at 11.) According to Defendants, a buyer of continuous shufflers, for instance, could only have been harmed if the sham litigation targeting continuous shuffler competitors succeeded; conversely, if that customer's purchases were all in a segment where no competitor would have emerged, the customer might have suffered no injury. (*Id.* at 22.) In Defendants' view, the case would splinter into "a series of mini-trials" to determine: (1) what types of shufflers each class member bought;

46

(2) which (if any) suppressed competitor would have entered each of those shuffler type markets in the but-for world; and (3) in what years the but-for competition would have driven prices down for that type. (*Id.* at 19–26.)

This argument, however, overlooks the unifying theory of harm in this case and the evidence that Defendants' conduct had a broad impact across the entire market. Plaintiffs allege an integrated monopolistic scheme aimed at maintaining dominance in all segments of the market. As the Supreme Court and the Seventh Circuit have explained, courts must not dissect such a course of conduct into "tightly compartmentaliz[ed]" pieces when assessing its effect. Instead, courts must consider the overall picture of Defendants' actions. *Cont'l Ore*, 370 U.S. at 699 (warning against "dismembering" a monopolization scheme into isolated parts); *Mishawaka*, 616 F.2d at 985 (same).

Moreover, Plaintiffs argue persuasively that Defendants' attempt to cabin injury by shuffler type is inconsistent with the evidence. (Dkt. 172 at 13–14.) For example, it is not the case that Defendants only harmed customers of Type A shufflers when they litigated against a Type A competitor. Rather, when Defendants took anti-competitive action against a particular rival, it often eliminated that rival's entire business, including other products. (Dkt. 150 at 12 n.9.)

Internal documents could support the theory that Defendants' goal was to eliminate shufflers in general (not merely one model) as a competitive threat. (Dkt. 129 ¶ 17.) And, as Plaintiffs note, this strategy worked. Defendants broadly deterred competitors from entering the shuffler market in the United States even when

47

Defendants' sham litigation only focused on some shuffler types (Dkt. 156-4 at 235:7-237:23) (competitor stated they would not enter the market because "[t]he bottom line is we don't want to be like VendingData, we don't want to go bankrupt.")

In short, there is evidence to suggest that the ripple effects of each anticompetitive act extended market-wide. As the Seventh Circuit has held, the proper analysis looks at the cumulative effect of Defendants' series of interrelated anticompetitive acts over two decades to maintain their monopoly. *Mishawaka*, 616 F.2d at 985. That effect here, if Plaintiffs' allegations are proven, was to foreclose competition across the board and keep all prices higher than they otherwise would have been.

To be sure, questions of market definition and product interchangeability are in play. But those too are classwide issues. Defendants assert that each shuffler category (continuous vs. batch, etc.) is used for distinct purposes and "cannot simply be substituted" for another. (Dkt. 148 at 20.) Plaintiffs counter with evidence that the lines between categories are blurry. For instance, continuous and batch shufflers compete for the same blackjack and baccarat tables (Dkt. 157 at 22), and Defendants' own single-deck batch shuffler (DeckMate) competed with their multi-deck continuous model (One2Six) and a competitor's specialty shuffler (DigiDeal's iDeal). (Dkt. 150 at 10.) The extent to which different shuffler types are interchangeable or part of the same product market is a common question—one affecting the classwide theory of harm—that will be answered with common evidence (industry expert testimony, Defendants' documents, etc.).

At this stage, Plaintiffs have adequately shown that the relevant market can be treated as one market for automatic card shufflers (encompassing various subtypes). Whether competition in that market was unlawfully suppressed is therefore a predominantly common matter. *Kleen*, 831 F.3d at 927–29 (plaintiffs must offer a workable common method to prove antitrust elements); *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 153–55 (3d Cir. 2002) (impact presents classwide questions).

Plaintiffs' expert evidence supports a finding of predominance despite Defendants' critiques. Dr. Baldwin's yardstick and regression methodology is a generally accepted approach for evaluating classwide impact and damages in antitrust cases. (Dkt. 194 at 3) (approving yardstick method as a means of estimating damages); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655–56 (7th Cir. 2002) (recognizing regression analysis as a valid method to show classwide overcharges). Baldwin constructed a benchmark "from both card shuffler transactions and from a competitive yardstick benchmark" and employed regression analysis to estimate the overcharge. (Dkt. 126-18 at 6.) Baldwin also testified that even when accounting for potential differences between product types the overcharge percentage came out about the same (within about 1% variance). (Dkt. 169-7 at 179:11–180:3.)

Baldwin's analysis suggests, therefore, that the effect of Defendants' conduct was relatively uniform across the market—as Plaintiffs claim. And contrary to Defendants assertions (Dkt. 148 at 20), it also suggests that any differences among

49

shuffler types did not materially change the pricing impact. A single common overcharge factor is thus a reasonable approximation for the class. Defendants' own expert analysis, if it shows variation, can be presented to the factfinder, but it does not undermine the predominance of common issues.

Even if some individualized questions of impact or injury might arise at the margins (*e.g.*, whether a particular casino negotiated such a deep discount that it suffered no damages compared to the but-for world), those instances do not overshadow the common evidence that will drive the resolution of the case. That a few class members might have suffered no injury does not preclude certification. As the Seventh Circuit has made clear, a class can be certified despite a de minimis number of uninjured members. *Kohen*, 571 F.3d at 677–78; *see also Messner*, 669 F.3d at 823–24 (predominance satisfied where common evidence will resolve liability, even if some class members ultimately show no injury). Defendants have not demonstrated that any significant number of class members escaped harm. At most they speculate that larger buyers may have negotiated better terms, but that does not equate to no injury. In any event, such issues do not predominate over the core common questions.

**Predominance of Damages**: A separate consideration is whether damages can be measured on a classwide basis or instead whether individualized damage issues overwhelm common issues. It is well established that individual differences in the amount of damages will not defeat predominance so long as liability and impact are subject to common proof. *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013). As the Seventh Circuit noted in *Messner*, the presence of individualized

questions regarding damages "does not prevent certification under Rule 23(b)(3)." *Messner*, 669 F.3d at 815.

Plaintiffs propose a common methodology to calculate damages: applying Dr. Baldwin's overcharge percentage to the sales transactions of class members to compute the dollar overcharge suffered by each. (Dkt. 126 at 34.) Essentially, once it is established that prices were, say, 55% higher than they should have been (Dkt. 157-23 at 15, 16), the total damages for a given class member is 55% of the amount that class member spent on shufflers. This approach flows directly from Plaintiffs' theory of harm that every purchase was inflated by a roughly uniform percentage and is therefore consistent with their liability theory. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35–38 (2013).

Defendants argue that damages in this case are more complicated. More specifically, Defendants contend that damages depend entirely on what each casino purchased or leased and when; they insist that differences in product type and timing make damages highly individualized. (Dkt. 148 at 31–33.) But this argument merely repackages the impact contentions addressed above. To the extent the magnitude of the overcharge may differ by time period or product, Baldwin's analysis can account for that by using appropriate variables or separate calculations for sub-periods. (Dkt. 169-7 at 179:11–180:3.) In fact, as noted, Baldwin has already tested damages by shuffler family and by sub-period (post-entry of certain competitors) and found her aggregate model still holds. (*Id.*)

Defendants cite an out-of-circuit case, *Bell Atlantic Corp. v. AT&T Corp.*, 339

51

F.3d 294 (5th Cir. 2003), to suggest that Plaintiffs' damages model is too speculative or that losses may vary widely. But that case is distinguishable. In *Bell Atlantic*, the plaintiffs attempted to calculate *lost profits*—whereas here the formula is based on *prices charged*. 339 F.3d at 302–08. Indeed, this case presents a classic overcharge scenario well-suited to class treatment through common evidence. Plaintiffs' proposed damages model uses Defendants' own sales data and external benchmarks to compute the difference between actual prices and competitive prices. (Dkt. 126-18 at 6.) All data feeding the model is common to the class, and the outcome is an aggregate damages figure for the class: which can then be mechanically allocated pro rata based on each member's purchases. (*Id.* at 16.)

In sum, the Court finds that there is a workable, classwide method for calculating damages in this case and that individual damages questions, to the extent they exist, will not overwhelm the common issues.

**Predominance of Issues Concerning the Statute of Limitations**: Defendants argue that individualized issues related to the statute of limitations would predominate. (Dkt. 148 at 33.) Plaintiffs' class period extends back to April 1, 2009, but the suit was filed on April 2, 2021. *See generally* (Dkt. 1.) Because the Sherman Act has a four-year statute of limitations, this means that claims accruing before April 2, 2017 could be time-barred. 15 U.S.C. § 15b.

Defendants contend that each class member's knowledge of the facts giving rise to their claim could differ. (Dkt. 148 at 34.) For instance, a casino might have been well aware of Defendants' patent litigation through the media and thus

discovered their claim earlier, while a smaller casino may not have acquired that knowledge until later. (*Id.*) In Defendants' view, determining which class members' claims are timely would require examining what each casino knew or should have known and when, making it an individualized inquiry that undermines predominance. (*Id.*)

Potential statute of limitations issues do not preclude class certification. Courts typically hold that potential statute of limitations defenses, especially in antitrust cases, do not bar certification, because those issues rarely predominate over the common issues of liability and impact. *Sebo v. Rubenstein*, 188 F.R.D. 310, 316 (N.D. Ill. 1999); *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 671–72 (7th Cir. 2015). This is particularly true where the alleged conduct is inherently self-concealing or where there is a continuing violation. *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189–90 (1997) (concealment or continuing-violation tolls statute-of-limitations); *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 725 (N.D. Ill. 2016). Plaintiffs make both of those arguments. (Dkt. 172 at 22–24.)

Even if some class members had inquiry or actual notice earlier than others, courts have found that such timing differences "will not be so consuming that they take the focus away from the merits of the case." *Sebo v. Rubenstein*, 188 F.R.D. 310, 316 (N.D. Ill. 1999). That argument can be decided on a classwide basis or with common evidence about what information was publicly available and whether a reasonable purchaser would have discovered the claim. *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756–57 (7th Cir. 2014) (reversing denial of certification because

53

whether a defendants' uniform packaging would mislead a reasonable consumer is a common, objective question). All class members share the argument that the statute of limitations was tolled until at least 2017 due to the hidden nature of the fraud and the fact that prices remained high, so the injury was ongoing. (Dkt. 172 at 22–24.) Based on these considerations, the Court agrees that any statute of limitations issues can be managed and do not overwhelm the common issues.

Having considered all the factors discussed above, the Court finds that common issues predominate in this litigation. At the core of this case is an alleged monopolization scheme and its classwide effects; whether those allegations are true will be determined by evidence common to all class members. Moreover, the individual issues identified by Defendants either are not truly individual in nature or can be handled in a manageable, secondary fashion. As a result, the predominance requirement of Rule 23(b)(3) is satisfied.

### 7.   *Rule 23(b)(3)—Superiority*

Rule 23(b)(3) also requires that a class action be superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3). The Rule sets out factors to consider, such as class members' interest in individually controlling their own litigation, the extent of any other pending litigation on the matter, the desirability of concentrating the litigation in one forum, and the manageability of a class trial. *Id.* All these factors point toward class treatment being superior in this case.

First, the putative class members, casinos and gaming companies, have little interest in pursuing individual lawsuits for this matter. *Carnegie v. Household Int'l,*

54

*Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) (stating that a "realistic alternative to a class action is not [many] individual suits, but zero," because only a "lunatic or a fanatic" brings a small-stakes claim alone). No class member has come forward to object or demonstrate a strong desire to proceed alone. In fact, only a few competitors have sued, and no casino has separately sued over shuffler prices. (Dkt. 123 at 35.) This lack of a multitude of individual suits suggests that a class action is needed to vindicate the rights at stake. *First Impressions Salon, Inc. v. Nat'l Milk Producers Fed'n*, No. 3:13-CV-00454, 2017 WL 11681189, at *15 (S.D. Ill. Sept. 29, 2017) ("[T]hat only one retailer has filed a similar claim suggests a lack of interest on the part of the retailers in pursuing their own litigation.") Many class members are smaller casinos for whom the damages may not justify the burden and expense of a complex antitrust lawsuit. (Dkt. 1 ¶ 99; Dkt. 157 at 99 ¶ 23.) A class action aggregates these relatively modest individual recoveries to make litigation economically feasible.

Second, concentrating this dispute in a single forum is desirable and efficient. *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) (class actions promote efficiency and conserve judicial resources). The case has been pending here and managed through coordinated discovery. Moreover, the Court is familiar with the issues, and it makes sense to handle all class members' claims together rather than in courts around the country. There is no indication of any other overlapping suits proceeding elsewhere on behalf of these victims (Dkt. 123 at 35), so a class action here will not interfere with other proceedings. Instead, it will prevent inconsistent judgments and avoid wasting judicial resources. *Carnegie*, 376 F.3d at 661.

Third, a class action is manageable. Although the case involves complex antitrust issues, those issues will be litigated with common proof. A class trial would focus on Defendants' conduct and the impact on the market as a whole, aided by expert testimony applicable to everyone. *Butler*, 727 F.3d at 801–02 (endorsing centralized resolution of common liability questions with case-management tools for any individual issues). This is far more manageable than conducting mini-trials for each class member on the same issues. If the class prevails on liability, any individual questions, such as the distribution of damages to class members, can be handled through a standardized claims process. *Mullins*, 795 F.3d at 666–73 (courts may use affidavits, receipts, and audits to administer claims without mini-trials). But damages can likely be calculated formulaically for each class member from Defendants' transaction data. (Dkt. 126-18 at 8.)

In sum, the class device is not only superior but perhaps the only practical method to resolve these claims fairly and efficiently. Rule 23(b)(3) is satisfied in both of its prongs: predominance and superiority. Accordingly, this case is appropriate for class adjudication.

* * *

In view of the foregoing analysis, the following Class is certified:

> All persons and entities that directly purchased or leased automatic card shufflers within the United States, its territories, and the District of Columbia from any Defendant or any predecessor, subsidiary or affiliate thereof, at any time between April 1, 2009 and December 31, 2022. Excluded from the class are Defendants, any parent, subsidiary, or affiliate thereof, Defendants' officers, directors, employees, and immediate families, and any judicial officers or their staff working on this action. Also excluded from the class are all persons

56

and entities whose claims are subject to arbitration, as well as any purchase or lease transactions of automatic card shufflers, by class members, that are subject to arbitration.

## IV.    CONCLUSION

Defendants' motion for summary judgment is denied in large part, and Plaintiffs' motion for partial summary judgment is denied in full. Plaintiffs' motion for class certification is granted.

SO ORDERED in No. 21-cv-01798.

Date: March 31, 2026

_____
JOHN F. KNESS
United States District Judge